IBP, INC., Appellant,

v.

**CITY OF COUNCIL BLUFFS, IOWA, A Municipal Corporation, Appellee.**

No. 92–1671.

Court of Appeals of Iowa.

Nov. 29, 1993.

Mark McCormick and Margaret Callahan of Belin, Harris, Lamson, McCormick, P.C., Des Moines, and Peter J. Peters of Peter J. Peters, P.C., Council Bluffs, for appellant.

Richard B. Wade, City Atty., Council Bluffs, for appellee.

Heard by OXBERGER, C.J., HABHAB, J., and KEEFE, Senior Judge.*

HABHAB, Judge.

In 1985, the plaintiff, IBP, Inc., developed a plan to reopen a meat packing plant in Council Bluffs with the City's assistance. In May 1986, IBP and the City entered into an agreement for the City to provide a $100,000 grant to IBP for the plant and to treat the plant's waste water at reduced rates. A provision of the agreement stated the rates would be fixed for a period of three years. After that period the rates would be subject to increase at the same percentage rate of increase as applied to all other users.

The City charges a base sewage rate which is to cover the cost of treating sewage that contains only certain levels of waste and imposes a surcharge rate [1] to cover the cost of treating sewage which has certain waste above those levels. The agreement between the parties provided that they intended to enter into a waste water pretreatment agreement at a later date and that the entire agreement would only be enforceable to the extent it did not conflict with either state or federal law. IBP claims that on the basis of the agreement it made capital investments and incurred start-up costs.

In May 1989, as the agreement's moratorium on rate increases was expiring, representatives of the parties met. At that meeting it was learned that IBP needed the flow and loading limits increased on its waste water discharge permit. The City's response was that it would not be willing to increase the limits under the existing rate structure and discussed an increase of the surcharge rates with IBP officials. The City claims the officials indicated the proposed rates would not be a problem. The City subsequently issued a new waste water discharge permit to IBP which provided for over a million gallons a day increase in flow but did not increase the total allowable waste.

The City by ordinance then changed the surcharge rates for all users to a uniform rate. The City claims the increase was consistent with its agreement with IBP. IBP, however, claims the City breached its agreement by increasing only sewage surcharges and that the surcharge increase was not proportional as to all users.

On the basis of these claims, IBP brought an action against the City seeking an injunction against any collection by the City of the increased sewage rates, a declaration of the rights of the parties regarding the 1986 agreement and future sewage rate increases,

---

* Senior judge from the 1st Judicial District serving on this court by order of the Iowa Supreme Court.

1. A surcharge applies where the customer's discharge contains more than the permissible amount of BOD, suspended solids, or oil and grease. "BOD," or biochemical oxygen demand, refers to the volume of oxygen consumed in the biological processes that break down organic matter in water by aerobic biochemical action.

and damages under theories of breach of contract and promissory estoppel. The City answered that the 1989 increase of the surcharge rates was consistent with the 1986 agreement, the provisions of the 1986 agreement which attempted to regulate rates were contrary to state law, and the setting of a utility rate is a legislative function which could not be contracted away by the City.

On September 22, 1992, the district court ruled that the increase of the surcharge rates did not violate the May 1986 agreement between the parties and was not discriminatory against IBP. Particularly, the court determined that the amended increase of the surcharge rate was the same for all users.

IBP appeals.

■ Our review on appeal is governed by how the case was tried in district court. *Hawkeye Land Co. v. Laurens State Bank,* 480 N.W.2d 854, 856 (Iowa 1992). Since this case was tried in equity, our review is de novo. Iowa R.App.P. 4. We give weight to the district court's findings of fact but are not bound by them. Iowa R.App.P. 14(f)(7). We examine the whole record and determine the issues anew from the credible evidence. *White v. Board of Review,* 244 N.W.2d 765, 772 (Iowa 1976). Our courts have consistently recognized that, while in cases of equity the reviewing court is not bound by the fact findings of the trial court, factual disputes which depend heavily on the credibility of witnesses are best resolved by the trial court which has a better opportunity to evaluate credibility than we do. *Maisel v. Gelhaus,* 416 N.W.2d 81, 86 (Iowa App.1987).

## I.

■ Appellant first asserts appellee breached the 1986 agreement by increasing only the sewage surcharges. The language at issue is found in section VIII of the May 17, 1986 agreement:

The City agrees to treat wastewater from IBP Pork Processing Plant pursuant to the following sewage rates:

a) The base rate shall be 0.27/1,000 gallons and will be applied to wastewater which meets the following concentration parameters:

| Parameter | Concentration |
|-----------|---------------|
| CBOD $_5$ | 350 ppm [2] |
| TSS | 350 ppm [3] |
| O & G | 100 ppm [4] |

b) Wastewater which exceeds the parameters listed above shall be charged as follows:

| Parameter | Concentration [sic] |
|-----------|---------------------|
| CBOD $_5$ | $0.024 |
| TSS | 0.034 |
| O & G | 0.017 |

Surcharge rates and base rates shall be fixed for three (3) years, then *the rates established herein are subject to increase at the same percentage rate of increase as all other users.* Moreover, the parties intend to enter into a wastewater pretreatment agreement at a later date.

(Emphasis added).

Appellant introduced testimony at trial it understood the highlighted language was intended to link the base rate and surcharge rates so that appellee could not increase rates significantly without facing political pressure from "all other users." Nothing in the language, however, requires linking the rates to each other so any increases must affect all the rates. To the extent the 1989 ordinance did not link base rates and surcharge rates, we conclude the ordinance does not breach the terms of the contract and affirm the district court.

## II.

Although we determine the language of the agreement permits appellee to raise the surcharge rates or the base rate independently, it still requires any increases to be "at the same percentage rate of increase" for appellant as for other users. Appellant, in the

---

2. "CBOD $_5$" means carbonaceous biochemical oxygen demand (five day), "the amount of oxygen in the biological processes that break down carbonaceous organic matter in water by aerobic biochemical action in five days at 20° C."

3. "TSS" means total suspended solids, sometimes called nonfilterable residue.

4. "O & G" means oil and grease.

1986 agreement, negotiated a lower surcharge rate as a significant user.

To have a better understanding of the problems before us, we return briefly to the rate system used in Council Bluffs. For users who are defined as significant users, based on concentration and raw flow prior to pretreatment, the flow rate is $.20 per one hundred cubic feet. This rate is intended to cover the cost of treating the flow so long as the biochemical oxygen demand (BOD) does not exceed 350 parts per million by weight, and suspended solids do not exceed 350 parts per million by weight, and recoverable oil and grease do not exceed 100 parts per million by weight. If any of these limits is exceeded, then a per pound surcharge is applied to the excess.

There are three different rates for surcharges that are pertinent to this matter. The following chart illustrates the percentages of the surcharge increases (and decrease) adopted by the City in the September 1989 ordinance:

|  |  | 1986 Surcharge | 1989 Surcharge | Percentage Change |
|---|---|---|---|---|
| BOD | General | $.05 | $0.47 | 6% decrease |
|  | IBP | $.024 |  | 95.8% increase |
| Suspended Solids | General | $.07 | $.097 | 38.6% increase |
|  | IBP | $.034 |  | 185% increase |
| Oil and Grease | General | $.035 | $.047 | 34% increase |
|  | IBP | $.017 |  | 176% increase |

In order to eliminate the difference between the rate negotiated by appellant in 1986 and the 1989 ordinance rate, appellee had to increase appellant's rate at a much higher percentage than applied to other users. We conclude such application of the 1989 ordinance to appellant violates the clear language of the 1986 agreement and to that extent reverse the district court and remand with instructions. The court shall issue a permanent injunction prohibiting appellee from enforcing any rate increase against appellant in excess of the percentage amount permitted by section VIII of the 1986 agreement. See Division IV.

### III.

Appellee urges us to find the 1986 agreement unenforceable for several reasons. Two of the reasons urged were not argued in the district court. We do not address them for the first time on appeal. *See South Ottumwa Bancshares, Inc. v. First Interstate of Iowa, Inc.*, 484 N.W.2d 586, 588 (Iowa 1992). We address the other two contentions in turn.

Appellee first urges section X of the 1986 agreement makes the agreement unenforceable because the rates in section VIII violate Iowa Code section 388.6 (1991) which states:

A city utility or a combined utility system may not provide use or service at a discriminatory rate, except to the city or its agencies, as provided in section 384.91.

*Id.* Appellee argues the reduced rate negotiated with appellant is discriminatory because "it forces the other users of the city wastewater treatment facility to subsidize IBP Inc."

Section 388.6, however, does not stand alone in the code. In interpreting statutes, we attempt to give meaning to all parts. *See General Elec. v. State Bd. of Tax Review*, 492 N.W.2d 417, 420 (Iowa 1992). In determining the intent of the legislature, we consider all parts of the statute, "without giving undue importance to a single or isolated part." *Iowa Beef Processors, Inc. v. Miller*, 312 N.W.2d 530, 532 (Iowa 1981). Chapter 388 deals with city utilities. Chapter 384 covers city finance. Iowa Code section 384.84 authorizes the governing body of a city utility

to set rates and to enter into contracts for utility services with "persons whose type or quantity of use or service is unusual." Iowa Code § 384.84(2)(a), (b). Appellant certainly falls within this definition. Appellee, therefore, had the authority to enter into the agreement with appellant, agreeing to a special rate because of appellant's unusual type and quantity of use. *See id.* at § 384.-84(2)(b).

Contracting for a special rate for unusual users is not per se discriminatory. Appellant's type and quantity of use is unique. We find appellee did not discriminate against other users in agreeing to a lower surcharge rate for appellant than for "usual" users. Appellee exercised its statutory authority to distinguish users by the type and quantity of use and set rates accordingly. The agreement does not violate Iowa law. Section X of the agreement, therefore, does not prohibit enforcement of the agreement.

■ Appellee next asserts the section VIII rate limitation cannot be enforced because appellee cannot bind itself in the future performance of its governmental functions. We disagree for several reasons. First, we are not convinced the activity complained of is a governmental, as opposed to a proprietary, activity. Our cases make it clear rate setting is not a judicial function. *State v. City of Iowa City,* 490 N.W.2d 825, 829 (Iowa 1992); *Knotts v. Nollen,* 206 Iowa 261, 262, 218 N.W. 563, 564 (1928). Owning and operating a public utility is a corporate, not governmental function. *Id.* "Indeed, the fixing of rates has been termed a proprietary rather than a governmental function, limited only by statute or contractual agreement." 12 Eu-gene McQuillan, *Law of Municipal Corporations* § 35.37 at 607 (3d ed. 1986).

Second, the power of cities to fix utility rates is statutory rather than constitutional. Iowa Code § 384.84; *Iowa–Nebraska L. & P. Co. v. City of Villisca,* 220 Iowa 238, 247, 261 N.W. 423, 428–29 (1935). The legislature may allow municipalities to enter into contracts which would bind future city councils. *Id.* 220 Iowa at 247, 261 N.W. at 429. We find the 1986 agreement allowable under the statute and binding on future city officials. *See* Iowa Code § 384.84(2).

Third, the 1986 agreement does not inhibit future city officials from setting rates for city utilities. It only prevents appellee from targeting appellant for disproportionate increases. The agreement merely requires that any rate increases be applied to appellant at the same percentage increase as applied to other users.

## IV.

The district court's determination the 1986 agreement allows base rates and surcharge rates to be raised independently is affirmed. The district court's determination the 1989 ordinance does not violate the 1986 agreement is reversed and the case remanded with the following instructions. The court shall issue a permanent injunction prohibiting appellee from enforcing any rate increase against appellant in excess of the percentage amount permitted by section VIII of the 1986 agreement. Applying the percentage changes for other users to the 1986 agreement rates gives the following new rates:

| Parameter | 1986 Agreement | % Change | New Rate |
|-----------|----------------|----------|----------|
| CBOD$_5$ | 0.024 per pound | (–6) | 0.023 |
| TSS | 0.034 per pound | 38.6 | 0.047 |
| O & G | 0.017 per pound | 34 | 0.023 |

The court shall issue a declaratory judgment concerning the rights and obligations of the parties consistent with this opinion. The funds in escrow shall be returned to appellant to the extent they represent payment of rates which exceed the new rates calculated above. The escrowed funds which represent payment of allowable changes in rates shall be released to appellee. Interest on the escrowed funds shall be apportioned in the same percentage as the principle.

Since we find no basis in the record for damages, none are awarded. Costs of this appeal are taxed to appellee.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

DONIELSON, J., takes no part.